Before we begin the arguments this morning, we have the pleasure of moving the admission of some of our law clerks, and Judge Chen, why don't you begin? Yes, thank you, Judge Zak. I have a motion. This morning I'd like to move the admission of Deepa Kanepan, who is a member of the Bar and is in good standing with the highest court of California. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. I've known Ms. Kanepan for three years now, when I interviewed her at a cafe in San Mateo, and I had a hunch that she would make an excellent clerk, and she has proven me right all the way through. She's been a truly excellent clerk with a very strong analytical mind, fantastic writer, saved me from a lot of mistakes, and also has just really excellent judgment for a young person, and not to mention a sparkling personality. I strongly urge that the court grant my motion. I support the motion. Your motion is granted, Judge Chen, and thank you for your service at the court. Please raise your right hand. Do you solemnly swear or affirm that you will comport yourself as an attorney and counsel of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the modern United States Court of Appeals. I have the pleasure of moving the admission of three of my law clerks, the fourth one having already been admitted to the bar of this court. So I move the admission of Marta Tristanoff, who is a member of the bar and is in good standing with the highest court of Texas, and I have knowledge of her credentials and am satisfied she possesses the necessary qualifications. And so the second one is I move the admission of Christopher James Marth, who is a member of the bar and is good standing with the highest court of California. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. And then the third is I move the admission of Catherine E. Rhodes, who is a member of the bar and in good standing with the highest court of Illinois. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. And it's been an enormous pleasure to have the three of you, the four of you. This year, as my law clerks, you've all done an outstanding job. This has been not only a year in which you've all done excellent work, but as Judge Chin said, you have sparkling personalities. Well, sort of sparkling personalities. And I'm really grateful, and it's going to be sad to lose you at the end of the year. And that applies to Mateus also, who's already sworn in. So why don't the three of you take the oath? Wait, wait, wait. That's right. The motion has to be granted. I am persuaded by Judge Blake's argument. I defer to Judge Dyke's judgment on this. The motion is granted. Please raise your right hand. Do you solemnly swear or affirm that you will support, that you will swear or affirm that you will comport yourself with the attorney and counsel of this court uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the bar of the United States Court of Appeals of the Federal Circuit. You're welcome. Thank you. Okay, now we have three argued cases this morning. The first is number 18-1574, Arthrex, Inc. v. Smith & Nephew, Inc., Mr. Chow. Can I please show them to you? Yes, go ahead. Go ahead, please. Thank you. Your Honors, may it please the Court, I'd like to start out with Claim 11, if it pleases the Court, specifically the ground for rejection that is based on Gordon and West. I would simply say that when one reads the decision by the Board, one is left wanting with justification for the combination. And what is particularly troubling about this decision is the change of direction that the Board took from what Smith & Nephew argued. Smith & Nephew argued three reasons to combine Gordon with West. None of those reasons were adopted by the Board. Instead, the Board went its own way. And this Court is, I understand, in the case of Magnum Oil and Serona Dental, reluctant to deviate from the statute that requires that the grounds that support the ground for obviousness be set forth in the petition. And the ex post facto attempt by Smith & Nephew's counsel to justify the Board's decision demonstrates that this ground was not in the original petition. The ground that they now say supports the reason that the Board said it was preferred is because of the mere order of the presentation of the ways that one could make the suture anchor in question. They say that there were two ways of doing it, and because one was listed first, the Board called that primary, and then Smith & Nephew then means that must mean preferred. None of that was in any of the petition of Smith & Nephew, nor was it in the declaration of Smith & Nephew's experts. And because of that, the Board did deviate from what was originally set forth in the petition. Putting that aside for now, the Board decision is also insufficient because it does not explain the reasons why one option would be preferred over another. And for that reason alone, this case must be reversed. There is no explanation of why would one be... Didn't the Board say that the reference taught the two alternatives, either integral or not integral, and so therefore one of Ordinary Scalene Art would have the option of using one or the other? Is that, in effect, what the Board said? The Board did say that, but I would say also that the Board used those teachings to demonstrate that you could do it this way. But the Board did not use those findings to say that you would, in fact, do it this way. And in fact, Smith & Nephew's... Where the reference teaches two alternatives, why isn't that enough to show that one of Ordinary Scalene Art would have used one of them or both of them or would have had the option to use either one? Well, this is the theory of finite options or obvious to try. And again... Finite option is obvious to try? Well, that's how Smith & Nephew characterizes their limited options, and I believe that the Supreme Court did discuss this option of obvious to try or equate the two of finite options with the options to try... I'm sorry, obvious to try in KSR. But if you are given limited options, you still have to show that there's a reason, a market demand. Why would you choose this option over another? When Gordon itself teaches the best way it knows how to do it, which is to make these things separate, there must be a reason why you would do that, especially in view of the testimony of Mr. Rechart, who explained that's not the way he would do that. And that concerns me, is that the Board did not even address that argument. He said that it would be not his way to do it because of the issues with flashing, weak spots, voids. There are problems associated with making this device into one piece, which is why Gordon, West, and most of the references that are shown show that the pin is actually separate from the anchor body and inserted later. And that is exactly what Mr. Rechart suggests that one should do. And for that reason, additionally, because the Board did not even address Mr. Rechart, who's not our expert, who is Smith and Nephew's expert, that is an admission by their technical expert as to how he would do it. He wouldn't do it the way that West teaches to make casting into one piece because of the challenges of casting. And he details all those challenges in his deposition testimony, which is completely absent from the Board's decision. And so from my perspective, Your Honor, there are two reasons why this should be reversed. The first is that it deviates from the original ground that Smith and Nephew offered. They didn't say that there are only two ways to do it. I think if they had said that, we could have said more. We could have said things like... Do I understand correctly that Smith and Nephew's expert had testimony in the form of a declaration explaining reasons for why one of ordinary skill in the art would have manufactured Gordon's anchor body and pulley out of the same material via casting process and testimony. But your position is because the Board didn't cite that, didn't rely on it, it cannot be substantial evidence to support the Board's analysis. I would also submit that under In Re Nuvasib that it would be a new ground. And that could be decided by this court under a de novo standard. Wait, why is that a new ground? It's a new ground because what Smith and Nephew argued were there are three ways to do it. And they were all motivation-based arguments. And the argument that is now being supported by the Board is that there are limited options or it was obvious to try. And to switch from three reasons to do it, three motivation-based arguments, to an obvious to try is different from what Smith and Nephew argued. What are you saying were the arguments raised in the petition? There were three arguments. One is that it would make it easier for FDA approval. The second, that it was a simple design choice. The third would make it stronger. The Board did not cite or even discuss any of those reasons to combine. And, of course, when you have to combine references, even though they set forth all these different elements, there still must be a reason to combine, as your Honor has said in Black and Decker. Even if there's a suggestion, there must be a reason why. And especially when one considers the problems associated with making it one piece, as Smith and Nephew's expert argues, then there must be more than just the option, the conclusory statement that it is preferred. And at best, we're left to guess. Well, the Board made that finding that casting the device would be preferred, right? The Board did make the finding that casting would be preferred, correct. Which would be a motivation to do it, right? That was, well, there were three motivations to address that. If something's preferred, that's the motivation to do it, right? Well, assuming that is, because I've heard, if it's obvious to try, whether it's preferred, there are three reasons that are set forth in the petition. The Board itself cites those three reasons why. And it doesn't say which of the three reasons. If the Board had said, well, we think it would be preferred because it's better for FDA approval. We think it would be better because it was a simple design choice. We think it would be better because it was stronger. It's not enough to say it's preferred? I don't believe so, Your Honor. Under DSS, what's— My understanding is the Board read the reference to say that there was a primary embodiment and there was an alternative embodiment. The primary embodiment was to cast the whole device. And then after that sentence, the reference said, alternatively, you could make the pin separately from the rest of the device. And so the Board understood the juxtaposition of those two disclosed embodiments with the word alternatively to suggest that the lead disclosed embodiment casting was the preferred embodiment. And that's a fact-finding in terms of how the Board chose to read that reference, isn't it? It is a fact-finding in how the Board chose to read the reference. However, Smith & Nephew, nor did any of its experts say, the reason why I think we think it's preferred is because it's the first listed option. In fact, when one looks at West, one is confronted with the fact that all the drawings show the pin separate from the anchor body, and that Smith & Nephew's own expert indicates that that's not the way he would do it. In fact, he says the opposite. He says the first way he would do it would be to create the anchor body and insert the pin separately to avoid the challenges of casting. Is it the rejection where Gordon teaches every single limitation of the claim except whether the pins are integral with the body? Is that right? Correct. Okay. But then, Your Honor, there still must be a reason to... It has a first suture opening, a second suture opening, a third suture opening. It has all those facts, but it doesn't have, if you look at the evidence that was offered by Smith & Nephew in the petition, if you look at what Smith & Nephew's own experts said, then there must be at least an explanation as to why those should be discounted. We're taught that Nuevesis teaches that those arguments should be counter... I mean, arguments, there should be reasons why the Board picked the path. And if we had an opportunity to understand which of the three reasons that Smith & Nephew offered that the Board picked, we would be here arguing that they were conclusory. Because if one looks at those reasons, they are, in fact, conclusory. So all that we are left here with is the notion that because you say this is listed first and then it's listed second, that that's definitely the way to do it. But you can't discount the testimony of Mr. Rechart, who made it very clear that that's not how he would do it. And that in itself was not a ground that Smith & Nephew's experts stood up to argue or support. They never said, because it's listed first, it should be this way. And I think if we had discovered that was going to be the basis for the testimony, we would have argued, or our experts would have argued and supported, that's not the preferred way to do it because of the challenges faced with casting. Because just simply because it's mentioned doesn't give you a reason to combine those references. And there was testimony from our own experts explaining why this is a sophisticated and nuanced technology and that the challenges of making a cross pin in one piece with the anchor body is very difficult. And I realize that I'm on borrowed time, so I'm going to, I guess I'll handle the rest in response. Okay. Thank you. Mr. Speed. Good morning. Good morning, Your Honors. I'll pick up right where Council for Arthritics ended, which was on Claim 11 on this one ground. I'll note first, just for clarity, that there's a wholly independent ground that the board relied upon in anticipation with Curtis to find Claim 11 unpatentable, and that was not addressed in opening argument. The board read West and read the embodiment that's described at Appendix 1768, which is Column 7, Lines 41 to 47. They read West. It's a fairly simple technology, and they found that passage where it says that in accordance with the present invention, you can cast everything as one piece. Alternatively, you can do it as a two-step process where you cast them separately, you drill a hole in the body, and then you insert the pin. The board was acting reasonably in its interpretation of that section as disclosing casting as preferred. While Arthritics focuses primarily just on the one sentence where the board reached its conclusion and said that because West teaches it as preferred, it would have been obvious, it ignores the scope and content of the prior art section where the board expressly walks through its interpretation of the reference and says that West is clearly disclosing two alternatives, a primary alternative in which the anchor body and posts are cast together, and an alternative in which they are cast separately. What's your response to his argument that this is a new ground that was relied upon by the board for the first time? In our petition at Appendix 218, this is where we put in the three different reasons, and I'll agree that we don't use the word preferred, but in the second reason, we cite to this exact passage in West, and we say that casting was a well-known and accepted technique for creating medical implant devices by September 2005. The board's decision to effectively recast that language as a preferred technique, we don't think is such a significant jump that the Magnum Oil concerns apply. Magnum Oil is a very different case in which the board instituted on a primary ground called the Lear reference, and then in the trial, it put the burden on the patent owner to prove that arguments related to a wholly different reference called the Alpha reference that wasn't even instituted somehow didn't apply to the Lear reference. So Magnum Oil is a very different case from this one. Here, we think it's completely fair for the board to have looked to our second argument, which they cite at page 54 of their final written decision, to find that West was teaching a preferred option for casting, and that, therefore, if it's preferred, it would have been obvious to cast the anchor as a single-piece solution. On the Curtis issue for Claim 11, in anticipation, the question there is whether or not there is substantial evidence to support the board's finding that Curtis anticipates. We'd submit that there's a lot of substantial evidence in the record on this, and particularly Curtis itself on the single-piece issue. The board, in its decision, looked at, relied primarily at page 74 of the decision, said, When manufactured and prior to installation, the one-piece configuration shown in figures 1 to 4 of Curtis is a suture-anchor assembly that is a rigid support integral with the suture body as recited in Claim 11. The board there is making clear it's relying on the figures of Curtis, and if you look at page 18 of our brief, it's clear from the images themselves, there's no break line between the various components. It is formed as a single-piece solution. The board, again, we would submit was reasonable its interpretation of the reference to be for it. On Claim 10, we'd submit that perhaps the easiest path to affirmance is on the helical thread issue. There, the parties agreed that a helical thread was a helical ridge or raised surface that serves to retain an anchoring bone. The dispute was whether or not a helical ridge, or sorry, a helical thread also had to facilitate. What's your best argument that the intrinsic evidence shows that there could be a helical thread that's tapped in? So Nicholson would probably be the best reference. No, I said intrinsic evidence. I don't think prior would be intrinsic evidence. So I respectfully submit that under V-Formation, the three references that we point out in our brief, Nicholson, McDevitt, and Curtis, they were all cited on the face of the 5-4. So they are intrinsic evidence. So at some point in time, Arthrex thought that those were references that were relevant to its invention, submitted to the Patent Office, and all three of those references are what's called expandable anchors, which for clarification, they aren't actually tapped in. They're just inserted into a hole that's actually a little bit bigger than they are, and then they're expanded to wedge in the hole so that they can't come out. And all three of those references describe their anchors as having helical threads. So those are anchors that are inserted axially, not rotated in, and they clearly have helical threads on their exterior. What about in the specification itself? Is there any sentence or anything that you rely on there for the support, the idea that the helical thread could be tapped in or not screwed in? Right, the specification itself has an embodiment that is clearly a screw-in anchor, and we would agree it's improper to exclude from the construction of helical thread that embodiment. The question is whether or not we need to take helical thread and then limit it to just screw-in anchors. And the intrinsic evidence, namely the other references that were cited on the face of the patent, make clear that it was known in the art that there were anchors that were not rotated into bone and that had helical threads, which is consistent also with the dictionaries that the parties submitted. All the dictionaries are defining helical thread not by its potential applications or functions, but by its physical structure, which makes sense. If you're looking at a screw, you're going to call it a helical thread versus a ribbed based on its structure, not on some potential function or application of that thread. On the suture opening issue for Claim 10, and this again is wholly independent and only needs to be reached if the court were to reverse on the helical thread issue. The board took our claim construction for suture opening and simplified it, but they didn't simplify it in a way that materially altered any issue of patentability in the case. We identified for the term suture opening as a term needing to be construed because it was relevant to priority. There are three embodiments in the specification, only one of which has the three suture openings that's recited in the claim. That's the second embodiment. That embodiment and the figures related to it was first disclosed in a September 2005 provisional, and so we went through the effort in our petition to perform this analysis, offer construction of suture opening because it was relevant to the issue of priority. In the patent owner preliminary response, Arthur X didn't dispute our priority analysis. It didn't offer a construction of suture opening. Indeed, it said that it was not disputed between the parties. The board and its institution decision agreed it wasn't in dispute between the parties. In its institution decision, however, it did reproduce the same annotated figures of the second embodiment that we submitted by petition. Patent owner response comes. Arthur X again doesn't just offer a construction for suture opening. It affirmatively agrees with us that the claims are directed to the second embodiment. And then the final written decision comes out and the board walks through the claim construction analysis and simplifies the construction, but does not take that simplified construction and alter anything in the case. We know this because when it's discussing the various embodiments, it was crystal clear that the only embodiment that had the multiple suture openings was the second embodiment. Under Arthur X's position on appeal, the board's construction should be interpreted to cover closed internal spaces, which would be the first embodiment. And at page nine of the opinion, the board is crystal clear that they do not believe that that first embodiment has multiple suture openings. Unless the panel has any questions of any of the other grounds, I'm happy to rest on their briefs. Thank you, Mr. Smith. Mr. Phan. Good morning, Your Honors. May it please the court, Dennis Phan on behalf of the United States as intervener on the constitutional issues. Of course, this court has heard a number of cases in which the government has presented arguments that- This patent was issued after the AIA. Exactly. And so there's two very quick threshold grounds that I want to address. This patent was issued after the AIA, so there can be no retroactivity challenge. Oil States entirely takes care of Article 3 and 7th Amendment grounds. This court's prior presidents, of course, take care of the due process concerns. And Oil States also does make clear that when a patent issues, when it's issued subject to inter partes review, it's subject to the conditions that are applicable at the time of the issuance. So there's no merit to the suggestion that simply because I applied for a patent before the AIA, I was issued a patent subject to laws prior to the AIA's enactment. The other threshold ground I want to briefly address is the one of forfeiture before the board. Of course, they have not raised any of these arguments before the board. And ordinarily, you would have to raise all arguments, including constitutional ones, before the board. I just want to highlight one of their types of arguments to suggest how that could be raised before the board. For example, they say that the panel was biased, and that is an argument that routinely goes before the adjudicator. So if you are in trial court, if you're in district court and you think your district court judge has some type of bias, you can file a motion to recuse. And so those types of arguments and the procedural due process arguments that they weren't afforded enough procedures within inter partes review, those types of arguments are certainly ones that are routinely adjudicated by agencies, by lower courts, and those at least and other constitutional claims should have been presented in this case, and they were not. What about the allegedly retroactive application of the new statute? Is that something that the board can entertain? So the board can entertain those arguments. And I have sort of three quick responses. Of course, there's been cases where the board has entertained it. In Agrawal v. Topgolf, which is currently pending before this court, in 18-2270, the board did entertain a retroactivity challenge. And the Supreme Court in Elgin v. Department of Treasury made clear two things about that. First, the question is whether or not the board can provide some type of relief. And, of course, if the board or the director had serious constitutional issues, and, of course, we think inter partes review is constitutional, but if the director had serious constitutional issues with some enactment of Congress, he wouldn't have to institute inter partes review in the first place. That is completely discretionary and something that the director can deny. The second part is even if the board can't fully address all aspects of a constitutional issue, Elgin makes clear that as long as you can address the threshold issues preceding that constitutional issue, those constitutional issues should also be raised before the board. So, for example, here, one of the claims is that this upsets the expectation interests of patent owners. And the board certainly can talk about what types of expectation interests apply when a patent owner first applies for their patent. The board can talk about the differences between inter partes review and ex parte reexamination or inter partes reexamination. The board can also talk about whether there have really been any changes to the substantive conditions of patentability or whether these are really simply procedural changes. Those are all matters that are traditionally within the board's expertise and they can build a record on that. They can have something that is suitable for this court's decision to affirm or reverse or to vacate and remand or otherwise. And there are no further questions on the constitutional issues. Okay. Thank you, Mr. Finley. Mr. Schell. Thank you, Your Honor. I would like to address the issue about whether this was in fact, I'm sorry, with regards to Claim 11. I would like to address the fact that this was a ground that was set forth in the petition. Smith and Effie for the first time now says that the reason why the board determined it was preferred is because the board equated simple with preferred. That is, it's a simple design choice as opposed to preferred. I think they said it was first, right? That's what Smith and Effie said in their brief. And here in their petition on APX 218, they say, it would have been logical to a person of ordinary skill in the art to manufacture the Gordon Anchor using a casting process. That's conclusory. Casting was well-known and an accepted technique for creating medical devices by September 2005. Using this well-known technique would have been a simple design choice. So we've moved from primary to being the support for preferred to now simple design choice. Your Honor, that's precisely the reason why, at a minimum, this decision must be remanded for further explanation as to why the board chose the path that it did. So this court has an opportunity to review the basis. Because if one looks at that explanation, it is, in fact, conclusory. And if one digs deeper into recharts... When you say looks at that explanation, it's conclusory, you're referring to the board's discussion? Oh, I'm referring to, I'm sorry, the petition about... I don't see that petition as being conclusory at all. If you read it, there's three or four paragraphs for why it would have been obvious to one of ordinary skill in the art. You're pointing at one sentence out of a whole page and saying it's conclusory. Let me rephrase. So what I mean by that is each one of those reasons must be supported by fact and argument and analysis. And I would submit that those decisions, saying that it's simply a simple design choice, those types of descriptions that the prior art teaches all of this doesn't give you a reason why. Those are separate elements that exist in the prior art, but there still must be a reason why. And when I lastly draw this court to Mr. Rechart's testimony, who said, why would you make putting the cross pin a secondary operation? That's their testimony. We never heard anything from the board about that testimony because cross pins represent a challenge. If you want them to be small, you got this larger anchor body, then you got this small cross pin. Now, it's not impossible, but it might make your life easier on the design. It might make it stronger. Possible. Now, why would cross pins be a challenge? As I mentioned, they're very small, typically on an anchor, and those are a little bit harder to fill. Not impossible. So then you would insert the cross pin after you cast the part? That's one way to do it, yes. And is that how you would do it as a design engineer? I would first, I would select that as my first choice. And I think due process at least requires, or at least the APA requires, that we have some explanation as to why the board chose to discount that testimony, those admissions. And simply listing something first in one small section. They have to discuss all the testimony? I'm sorry? As a matter of due process, they have to discuss all the testimony? I misspoke. I meant under the APA, under newvasive. That analysis requires us to explain why the board picked the path. Okay. Lastly, with respect to, am I out of time, Your Honor? You are out of time. Okay. Thank all counsel. The case is submitted.